THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BETHANY BOARDWALK
GROUP LLC,

*Plaintiff,*

v.                                              Civil Action No. ELH-18-3918

EVEREST SECURITY INSURANCE
COMPANY,

*Defendant.*

**MEMORANDUM OPINION**

This insurance dispute arises from losses sustained by a hotel due to a windstorm on September 9, 2018. Plaintiff Bethany Boardwalk Group LLC ("Bethany"), which owns the hotel, submitted a claim under its insurance policy with defendant Everest Security Insurance Company ("Everest"), seeking to recover costs incurred to repair the hotel's roof and for interior water damage, as well lost business income. Everest denied the claim on the ground that the hotel's roof was defective, and therefore Bethany's losses were subject to the policy's exclusion for faulty workmanship.

Thereafter, Bethany filed suit against Everest for breach of contract and declaratory judgment. ECF 1 (the "Complaint"). Plaintiff seeks a declaration that the policy covers the storm "as an occurrence and a specified cause of loss," and that Everest is liable for all losses sustained by the hotel "as a direct or consequent loss for the wind event." *Id.* ¶ 28(a). In addition to damages, Bethany requests prejudgment interest. *Id.* ¶ 28(b).[1]

---

[1] In what appears to be a drafting error, Bethany also asks the Court to award post-judgment interest to "Earth Treks." ECF 1, ¶ 28(c). Earth Treks is not a party to this action.

Bethany has filed a "Motion For Partial Summary Judgment As To [Everest's] Liability." ECF 27. The motion is supported by a memorandum of law (ECF 27-1) (collectively, the "Bethany Motion"), and seven exhibits. ECF 27-2 to ECF 27-8. Everest has filed a combined opposition to the Bethany Motion and a cross-motion for summary judgment (ECF 28), supported by a memorandum. ECF 28-1 (collectively, the "Everest Motion"). Bethany filed a combined opposition to the Everest Motion and a reply in support of its own summary judgment motion. ECF 29. Everest has replied. ECF 30.[2]

The motions are fully briefed and no hearing is necessary to resolve them. *See* Local Rule 105(6). For the reasons that follow, I shall grant the Bethany Motion (ECF 27) in part and deny the Everest Motion (ECF 28).

## I.    Background[3]

The material facts are undisputed. *See* ECF 27-2 ("Bethany's Statement of Undisputed Facts"); ECF 28-1 at 6 ("Everest adopts the statement of undisputed facts submitted by Bethany[.]").

Bethany owns and operates the "Bethany Beach Ocean Suites Residence Inn," a hotel located in Bethany Beach, Delaware (the "Hotel"). ECF 27-3 ("Burbage Affidavit"), ¶ 4. Built in 2015, the Hotel is comprised of two structures, each three stories, referred to as the "North Building" and the "South Building." *See id.* ¶ 7. In total, the Hotel includes 112 suites, five meeting rooms, a restaurant and bar, an indoor swimming pool with a retractable roof, and a fitness center and spa. *Id.* ¶¶ 4-5.

---

[2] Noting that the "case largely turns on contract interpretation of an insurance policy," and that the "operative facts are largely undisputed," the parties requested to proceed by way of pre-discovery cross-motions for summary judgment. *See* ECF 25.

[3] The Court notes that the electronic pagination does not always correspond to the page numbers that appear on the parties' submissions. I shall cite to the electronic pagination.

During the construction of the Hotel, CCS Roofing LLC ("CCS") was retained to install a thermoplastic polyolefin ("TPO") roof system. ECF 27-6 (10/5/2018 AET Preliminary Report) at 2. The roof system was manufactured by Firestone Building Products ("Firestone") and guaranteed by Firestone's 20-year "Red Shield Warranty." *Id.* CCS was a Firestone-licensed applicator. *Id.*

Installation of the TPO roof system unfolded in three phases. First, CCS covered the concrete roof deck with "polyiso insulation boards," rigid foam insulation sandwiched between reinforced paper material. ECF 27-7 (11/20/2018 AET Supplemental Report) at 7. CCS then stacked the boards in successive layers to create the roof slope necessary to direct roof runoff to various drain locations. *Id.* Finally, CCS glued a TPO membrane atop the insulation boards to form the roof's surface. ECF 27-6 at 3.

On September 9, 2018, a storm occurred in Bethany Beach, Delaware. *Id.*; *see also* ECF 27-3, ¶ 8. The storm produced "one of the windiest days on record since the TPO roof was installed" on the Hotel, generating wind gusts of up to 39 m.p.h. ECF 27-7 at 3. Although this was well below the 55-m.p.h. limit for a properly constructed TPO roof, according to Firestone's warranty, *id.* at 7, it was the third-highest wind speed recorded in the area since 2015. *Id.* And, the storm deposited between 0.11 and 0.50 inches of rain over a 48-hour period. *Id.* at 3.

During the storm, a roughly 50-foot section of the TPO membrane of the North Building's roof "peeled back," exposing the polyiso boards to the elements. *Id.* at 7; *see also* ECF 27-3, ¶ 8; ECF 27-6 at 3. As a result of the roof blow-off, water infiltrated the North Building at two locations. ECF 27-6 at 4. Water "migrated down an opening for a roof drain" into suite No. 301, requiring the replacement of portions of the drywall and the room's carpeting. *Id.* And, water migrated into the Hotel's restaurant, staining the drywall ceiling. *Id.*

Firestone dispatched Quality Exteriors Inc. ("Quality"), a licensed Firestone contractor, to perform emergency work on the roof on September 13 and 14, 2018. *Id.* at 3. Quality distributed sand bags and masonry blocks throughout the affected area to temporarily re-fasten the TPO membrane to the roof. *Id.* Nevertheless, Bethany incurred damages in excess of $100,000, including the cost of temporary and permanent repairs to the roof and to the interior of the Hotel, as well as lost business income. ECF 27-3, ¶ 12.

Following the storm, Bethany submitted a claim to Everest, its commercial property insurer. *Id.* ¶ 14. At the time, the Hotel was insured under a one-year commercial property casualty insurance policy issued by Everest on July 2, 2018. *Id.* ¶ 5; ECF 27-4 (the "Policy"). The Policy covered $9,669,000 for the North Building; $3,225,000 for business personal property; and $2,200,000 for loss of business income. ECF 27-4 at 17.

The Policy contains three forms relevant to coverage in this case: (1) the "Building and Personal Property Coverage Form," ECF 27-4 at 38-53; (2) the "Causes of Loss - Special Form," *id.* at 67-76; and (3) the "Wind-Driven Rain Limitation." *Id.* at 65.

Regarding coverage generally, the "Building and Personal Property Coverage Form" provides, *id.* at 38:

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

With respect to lost business income, the Policy states that Everest will pay for "actual loss of Business Income" sustained "due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" *Id.* at 54. However, in order for lost business income to be covered, the "loss or damage must be caused by or result from a Covered Cause of Loss." *Id.*

Section A of the "Causes of Loss - Special Form" defines "Covered Causes of Loss" as any "direct physical loss unless the loss is excluded or limited in this policy." *Id.* at 67. Further, Section G states: "Specified causes of loss mean the following: fire; lightening; explosion; *windstorm* or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." *Id.* at 76 (emphasis added).

Section B delineates the various events that are excluded from coverage under the Policy. Section B(1) provides that Everest "will not pay for loss or damage caused directly or indirectly" by (a) "Ordinance Or Law"; (b) "Earth Movement"; (c) "Governmental Action"; (d) "Nuclear Hazard"; (e) "Utility Services"; (f) "War And Military Action"; (g) "Water"; and (h) "Fungus, Wet Rot, Dry Rot And Bacteria." *Id.* at 67-69. Section B(1) contains what is known in the industry as an "anti-concurrent cause of loss of provision." *See* ECF 27-1 at 13. That clause specifies that loss or damage caused by these events "is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." ECF 27-4 at 67.

A second set of exclusions, located in Section B(2), provides, in relevant part, *id.* at 69:

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

\* \* \*

**d.(1)** Wear and tear;
  **(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\* \* \*

 But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

Finally, Section B(3) contains a third set of exclusions. It states, *id.* at 70-71:

**3.** We will not pay for loss or damages caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

    **a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

    **b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

    **c.** Faulty, inadequate or defective:
      **(1)** Planning, zoning, development, surveying, siting;
      **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
      **(3)** Materials used in repair, construction, renovation or remodeling; or
      **(4)** Maintenance; of part or all of any property on or off the described premises.

The parties acknowledge that the language in Section B(3) that restores coverage for a covered cause of loss that results after an excluded cause of loss is an "ensuing loss clause." *See* ECF 27-1 at 9, 14; ECF 28-1 at 8.

Also relevant here, Section C of the Cause of Loss - Special Form, titled "Limitations," states, *id.* at 72:

The following limitations apply to all policy forms and endorsements unless otherwise stated:

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

\* \* \*

    **c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, sleet, ice, sand, or dust, whether driven by wind or not, unless:

      **(1)** The damage or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or
      **(2)** The loss of damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

The "Wind-Driven Rain Limitation" is a separate document that modifies the limitation in Section C. ECF 27-4 at 66. The Wind-Driven Rain Limitation provides, in relevant part, *id.* at 66:

> Paragraph **1.c** of Section **C. Limitations** of the Causes of Loss - Special Form is replaced by the following:
>
> **c.** The interior of any building or structure:
>
>> **(1)** Caused by or resulting from rain driven by wind unless the building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain enters.
>>
>> The most we will pay under this limitation for loss of or damage to any building or structure is the Limit of Insurance shown in the Schedule.
>>
>> We will not pay for loss of or damage to any building or structure when the roof or walls of that building or structure are under repair, renovation or replacement at the time of loss.

The Policy provides coverage up to $250,000 for losses that qualify under the Wind-Driven Rain Limitation. *Id.*

Following Bethany's claim, Everest retained Applied Engineering & Technology, P.C. ("AET") to determine the cause of the roof malfunction. ECF 27-3, ¶ 15; *see* ECF 27-6 at 2. AET inspected the affected portions of the roof on September 21, 2018, and issued a preliminary report on October 5, 2018. ECF 27-6 at 2. After AET made a follow-up visit to the Hotel on November 2, 2018, it released a supplemental report on November 20, 2018. ECF 27-7 at 2.

Based on its inspections and tests, AET concluded that "the partial roof-blow incident was mainly caused by improper installation of the Firestone TPO roof system." ECF 27-7 at 7. The polyiso boards that comprise the roof system are designed to be fastened to one another with adhesive glue. *Id.* However, AET determined that "during the installation of the Firestone TPO roof system, too much time elapsed between the application of the adhesive glue striping and the installation of the next layer of polyiso boards." *Id.* This caused "a lack of proper bond between successive layers

of polyiso insulation boards," AET explained, which in turn "compromised the roof system's resistance to wind uplift pressures." *Id.* Further, AET concluded that excessive moisture found beneath the TPO membrane during inspections infiltrated "during the roof blow-off incident itself," as opposed to other prior construction activities on the roof. *Id.*

Everest denied Bethany's claim for coverage in a letter dated December 5, 2018. ECF 27-8. Specifically, Everest cited to Sections B(2) and B(3) of the Policy as the basis for denying Bethany's claim. *See id.* at 3-4. Everest said, *id.* at 2:

> [T]he damages sustained at your location were the result of faulty workmanship and improper installation. These damages sustained to your facility are not the result of a covered cause of loss as defined in your policy. As such, we regret to inform you that Everest will be unable to make a claim payment to the Bethany Boardwalk Group LLC DBA Bethany Beach Ocean Suites. This denial is due to specific exclusions as outlined in the applicable policy of insurance.

This lawsuit followed on December 19, 2018. ECF 1.

## II.    Standards of Review

### A.  Rule 56

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Id.* at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. Rather, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. 2019).

## B. Choice of Law

Jurisdiction in this Court is founded on diversity of citizenship. 28 U.S.C. § 1332.[4] In an action based upon diversity of citizenship, a federal court must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elect. Mfg. Co*., 313 U.S. 487, 496-97 (1941); *see Small v. WellDyne, Inc.*, 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d 270, 275 (4th Cir. 2007); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *Baker v. Antwerpen Motorcars, Ltd*., 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Both parties assume, without discussion, that Maryland law governs this dispute. ECF 27-1 at 11; ECF 28-1 at 18; ECF 30 at 8.

In a contract claim, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc*., 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002)

---

[4] To satisfy 28 U.S.C. § 1332, the party asserting jurisdiction must establish complete diversity of citizenship between the parties and an amount in controversy exceeding $75,000. *See Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). Both requirements are satisfied here.

Regarding citizenship, Everest is a citizen of Georgia, where it is incorporated, and New Jersey, where it has its principal place of business. *See* ECF 1, ¶ 1 (alleging Everest's citizenship); ECF 22, ¶ 1 (admitting allegation); *see also* 28 U.S.C. § 1332(c)(1). Because Bethany is a limited liability company, its citizenship is determined by the citizenship of its members. *Cent. W. Va. Energy Co*., 636 F.3d at 103. Bethany's members are citizens of states other than Georgia and New Jersey. ECF 1, ¶ 1. The amount-in-controversy requirement is met because Bethany avers that it has sustained greater than $100,000 in losses. ECF 27-3, ¶ 12.

(citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

The Policy does not appear to contain a choice of law clause. *See* ECF 27-4. Nor is it clear that the Policy was executed in Maryland, given that Bethany is a citizen of many states and the Hotel is located in Delaware. *See Porter Hayden*, 116 Md. App. at 673, 698 A.2d at 1200 (observing that "[t]ypically, '[t]he *locus contractus* of an insurance policy is the state in which the policy is delivered and the premiums are paid'") (emphasis and citation omitted).

However, the parties seem to suggest that Maryland law applies. Notably, "because the parties implicitly agree that Maryland law governs their claims, [the Court] need not inquire further into the choice-of-law questions." *Vanderhoof-Forschner v. McSweegan*, 215 F.3d 1323, 2000 WL 627644, at *2 n.3 (4th Cir. 2000) (table opinion) (citing *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)). Accordingly, I shall apply the substantive law of Maryland.

## C. Maryland Principles of Contract Construction

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Connors v. Gov't Emps. Ins. Co.*, 442 Md. 466, 480, 113 A.3d 595, 603 (2015); *Moscarillo v. Prof'l Risk Mgmt. Servs.*, Inc., 398 Md. 529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006). Accordingly, "'ordinary principles of contract interpretation apply.'" *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'" *Universal Underwriters Ins. Co.*

*v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)).  However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy.  *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Mitchell v. Md. Cas. Co.*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991).

As the Maryland Court of Appeals has explained, judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003). Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997); *accord Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's*, 788 F.3d 375, 379 (4th Cir. 2015).

"If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said." *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013)).  "'Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning.'"  *Md. Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 695, 114 A.3d 676, 681 (2015) (quoting *Mitchell*, 324 Md. at 56, 595 A.2d at 475).  However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding.  *Valliere v. Allstate Ins. Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which

differs from the ordinary understanding of that term, the policy definition controls."); *see also Dutta*, 363 Md. at 556, 769 A.2d at 957.

Where the insurance policy is unambiguous, the meaning of the terms is determined by the court as a matter of law. *Clendenin Bros. Inc. v. U.S. Fire Ins. Co*., 390 Md. 449, 459, 889 A.2d 387, 393 (2006); *see Pa. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 118 (4th Cir. 2012). In that circumstance, "'a court has no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutt*a, 363 Md. at 557, 769 A.2d at 1138). But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole*, 359 Md. at 305, 753 A.2d at 537. A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id*. at 306, 753 A.2d at 537.

"'[U]nlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'" *Capital City*, 788 F.3d at 379 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co*., 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Megonnell*, 368 Md. at 655, 796 A.2d at 771; *see Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros*., 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d at 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer."). In other words, where ambiguous language remains, the court "construe[s] that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument*.'"

*Connors*, 442 Md. at 481-83, 113 A.3d at 603-05 (emphasis in original) (quoting *Megonnell*, 368 Md. at 655, 796 A.2d at 772).

In Maryland, the insured party bears the burden of proving that coverage exists.  *See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 490, 66 A.3d 615, 624 (2013); *White Pine Ins. Co. v. Taylor*, 233 Md. App. 479, 497, 165 A.3d 624, 633 (2017).  If coverage is established, the burden shifts to the insurer to establish that a certain claimed loss falls within a policy exclusion.  *Beebe-Lee*, 431 Md. at 490, 66 A.3d at 624; *see also Finci v. Am. Cas. Co.*, 323 Md. 358, 593 A.2d 1069, 1087 (1991); *White Pine Ins.*, 233 Md. App. at 497, 165 A.3d at 633.  Because "'exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage.'"  *Megonnell*, 368 Md. at 656, 796 A.2d at 772 (citation omitted).

### III.    Discussion

This case principally concerns the scope of the Policy's ensuing loss clause.  The parties do not contest that the Hotel's roof was defective.  And, they agree that the "faulty workmanship" provision in Section B(3)(c) of the Policy expressly excludes coverage for such defects.  However, Bethany and Everest fiercely dispute whether the storm, a "Covered Cause of Loss," triggers the ensuing loss clause in Section B(3), thereby restoring coverage for the Hotel's losses.

According to Bethany, the damage to the Hotel was caused by an insured peril that occurred subsequent to and is distinct from the defective roof: the windstorm.  ECF 27-1 at 18.  Thus, in Bethany's view, the ensuing loss provision in Section B(3) requires Everest to cover all of the Hotel's losses that are traceable to the storm.  ECF 27-1 at 14-22; ECF 29-1 at 13-14.  Everest, however, contends that the ensuing loss clause does not apply because the wind is not an "independent cause of any property damage."  ECF 28-1 at 9.  Instead, it asserts that faulty workmanship is solely to

blame for Bethany's losses because, but for the defective roof, the storm would not have damaged the Hotel. ECF 28-1 at 9-23. Further, Everest contends that the Court should decline to apply the ensuing loss clause under the doctrine of "efficient proximate cause." *See id.* at 15-20.

Separate and apart from Section B(3), Everest also maintains that the Hotel's interior water damage was caused by "surface water" and therefore is excluded from coverage by the water exclusion in Section B(1)(g). *Id.* at 23. Bethany counters that the "Wind-Driven Rain Limitation" yields coverage for the Hotel's interior water damage. ECF 29-1 at 22-24.

As for Bethany's claim for lost business income, both parties appear to agree that those losses are covered only to the extent that the Hotel suffered a covered cause of loss. ECF 28-1 at 29; ECF 29-1 at 24-25. Therefore, Bethany's entitlement to lost business income under the Policy hinges on the applicability of the ensuing loss clause.

## A. Applicability of the Ensuing Loss Clause

The faulty workmanship exclusion in Section B(3) is qualified by an ensuing loss clause. It provides that Everest "will not pay for loss or damage caused by or resulting from" faulty workmanship, "[b]ut if [faulty workmanship] results in a Covered Cause of Loss," Everest "will pay for the loss or damage caused by that Covered Cause of Loss." ECF 27-4 at 70.

Ensuing loss clauses are commonplace in "all-risk" insurance policies. *See* 4 Philip BRUNER & PATRICK O'CONNOR, CONSTRUCTION LAW § 11:453 (2020) ("It is not uncommon for 'faulty workmanship exclusions' to contain an 'ensuing loss' exception."); Christopher C. French, *The "Ensuing Loss" Clause in Insurance Policies: The Forgotten and Misunderstood Antidote to Anti-Concurrent Causation Exclusions*, 13 NEV. L.J. 216, 217 (2012) (explaining that ensuing loss clauses

are "common" and "found in various types of property policies").[5]  Although the language of such

clauses varies, ensuing losses clauses operate to "preserve coverage when a loss excluded under a

policy—here, a loss caused by a defect in workmanship—results in a subsequent or 'ensuing' loss

that otherwise would be covered."  *Taja Invs. v. Peerless Ins. Co.*, 717 F. App'x 190, 192 (4th Cir.

2017); *see* 17A STEVEN PLITT ET AL., COUCH ON INSURANCE § 153:2 n.8 (3d ed. 2019).  In so doing,

the provision benefits both the insurer and the insured: it preserves the policy's exclusions while at

the same time guarantees coverage for covered losses notwithstanding the occurrence of an excluded

peril.

      The genesis of the ensuing loss provision helps to illuminate its intended effect.  The clause

got its start in the wake of the 1906 San Francisco earthquake.  *See* James S. Harrington, *Lessons of

the San Francisco Earthquake of 1906: Understanding Ensuing Loss in Property Insurance*, 37 THE

BRIEF 28, 28 (Summer 2008).  The 7.9 magnitude earthquake not only toppled buildings, it also

sparked massive fires that ravaged the city for three days.  Harrington, *supra*, at 28.  Together, the

earthquake and fires consumed more than 28,000 buildings.  *Id.*

      At the time, the garden-variety insurance policy covered fires but excluded coverage for losses

caused by earthquakes.  *See* French, *supra*, at 216.  As a result, many insurers refused to pay policy

holders for fire damage, arguing that it was the product of the earthquake.  *Id.*  The California

legislature responded by enacting a series of laws barring insurers from disclaiming coverage for fire

damage that followed an earthquake.  *Id.*  To comply with the law, insurance companies began

inserting language in their policies to make clear that losses caused by fires would be covered,

---

[5] An all-risk insurance policy is one that allocates risk to the insurer by covering all risks, except those specifically excluded.  17A STEVEN PLITT ET AL., COUCH ON INSURANCE § 101:7 (3d ed. 2019); *see also Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979) (describing "all-risk" policies as those that cover all fortuitous losses "absent express exclusion").

notwithstanding the earthquake exclusion. *Id.* Thus, the origin of the ensuing loss clause reveals that it is designed to preserve coverage for insured losses, such as a fire, but not to resurrect coverage for excluded losses, such as an earthquake or faulty workmanship.

Ensuing loss clauses are "well recognized in Maryland case law." *Selective Way Ins. Co. v. Nat'l Fire Ins. Co. of Hartford*, 988 F. Supp. 2d 530, 538 (D. Md. 2013) (citing *McEvoy v. Sec. Fire Ins. Co. of Balt.*, 110 Md. 275, 73 A. 157 (1909); *Transatlantic Fire Ins. Co. of Hamburg v. Dorsey*, 56 Md. 70 (1881)). In 1881, the Maryland Court of Appeals ruled that a clause that excepted from coverage "*explosions of any kind*, unless a fire ensures, and then for the loss of damage by fire only," *Dorsey*, 56 Md. at 77 (emphasis in original), covered fire damage "even though the fire had originated in an explosion." *Id.* at 79. The court cautioned that although the exception was "certainly very broad and comprehensive," it "must not be so construed as to defeat the main and principal object of the insurance." *Id.*

Although ensuing loss clauses are not new to Maryland, there appears to be a paucity of published decisions on the subject. To my knowledge, no Maryland appellate court has confronted an ensuing loss clause since the turn of the Twentieth Century. The parties point to no case, nor has the Court uncovered a published decision, addressing the question presented here: whether an ensuing loss clause applies to a covered loss that is causally related to an excluded peril, or applies only when the covered loss is the result of an independent or superseding event.

Furthermore, of the handful of decisions issued by courts in this District involving ensuing loss clauses governed by Maryland law, only one had the opportunity to opine on the provision's scope. *See Selective Way Ins.*, 988 F. Supp. 2d at 540 (water damage caused by faulty water line was an ensuing loss), *and compare with James McHugh Constr. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 F. Supp. 3d 462, 473-74 (D. Md. 2016) (ensuing loss clause was inapposite where the only

claimed loss—scratched windows—was directly caused by faulty workmanship); *Morgan-Keller, Inc. v. Lexington Ins. Co.*, GLR-12-2958, 2014 WL 12737621, at *4 (D. Md. June 16, 2014) (same); *Carney v. Assurance Co. of Am.*, JFM-04-3434, 2005 WL 899843, at *2 n.4 (D. Md. Apr. 19, 2005) (claimed loss was improperly treated wood siding), *aff'd*, 177 F. App'x 282 (4th Cir. 2006). The case of *Selective Way Insurance*, 988 F. Supp. 2d at 538, cited only two Maryland cases, *Dorsey* and *McEvoy*, and only for the proposition that ensuing loss provisions have long been recognized in Maryland.

The role of a federal court when considering an issue of state law is to "'apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue.'" *Askew v. HRFC, LLC*, 810 F.3d 263, 266 (4th Cir. 2016) (quoting *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co*., 514 F.3d 327, 329 (4th Cir. 2008)); *see also Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc*., 296 F.3d 308, 312 (4th Cir. 2002). Although it appears that the scope of ensuing loss clauses is an issue of first impression in Maryland, neither party asked this Court to certify a question of law to the Maryland Court of Appeals. And, I am satisfied that certification is not warranted.[6]

_____

[6] Under the Maryland Uniform Certification of Questions of Law Act, Md. Code (2013 Repl. Vol., 2019 Supp.), C.J. § 12-601 *et seq*., this Court may certify a question of law to the Maryland Court of Appeals "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [Maryland] appellate decision, constitutional provision, or statute . . . ." *See* C.J. § 12-603. Certification "ensur[es] the correct legal outcome, aid[s] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008).

When deciding whether certification of a question of law is appropriate, a federal court must undertake a two-part inquiry. First, the court must consider whether the answer "'may be determinative of an issue in pending litigation.'" *Antonio v. SSA Sec., Inc*., 749 F.3d 227, 234 (4th Cir. 2014) (quoting C.J. § 12-603)). Second, it must "evaluate whether [the question may be answered] based on a 'controlling appellate decision, constitutional provision, or statute of [Maryland].'" *Antonio*, 749 F.3d at 234 (second alteration in original) (quoting C.J. § 12-603).

This Court must predict how the Maryland Court of Appeals would rule if it confronted the issue. *See, e.g.*, *Delawder v. Am. Woodmark Corp.*, 178 F. App'x 197, 202 n.3 (4th Cir. 2006) (because no West Virginia court had defined a statutory term, the court "must predict how the West Virginia Supreme Court would define this term if it had to confront this issue"). In forecasting how the Maryland Court of Appeals would approach the question, I may consider treatises and the practices of other jurisdictions. *See St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 272 (4th Cir. 2004).

Despite the ensuing loss clause's quotidian nature and centuries-old pedigree, its effect remains clouded in confusion. French, *supra*, at 220 (the clause has "confused and divided the courts"); Harrington, *supra*, at 30 (the clause has "perplexed" courts). And, inconsistent decisions involving similar facts have led commentators to lament that the law is in disarray. *See* Paul T. Sullivan & Jeffrey A. Gordon, *A Review of Ensuing Loss Case Law: 2010 To Present*, 43 The Brief 18, 19 (Spring 2014); *see also* 4 Construction Law § 11:454 (detailing conflicting opinions concerning ensuing loss clauses issued by the Washington Supreme Court on the same day). In particular, jurisdictions are openly divided as to whether an ensuing loss clause applies to all covered losses that occur subsequent to an excluded peril, or only those losses that are independent of the excluded event. *See Taja Invs.*, 196 F. App'x at 593 (acknowledging the split); *Leep v. Trinity Univ. Co.*, 261 F. Supp. 3d 1071, 1082 (D. Mont. 2017) (canvassing divergent lines of authority); Sullivan & Gordon, *supra*, at 20-25 (discussing the conflict).

---

In my view, certification is not necessary in order to resolve the issue. I am satisfied that I am able to anticipate the way in which the Maryland Court of Appeals would rule. In any event, as discussed, *infra*, whether Section B(3) is construed broadly or narrowly, the outcome would be the same.

On the one hand, the "consensus approach" is that that an ensuing loss clause provides coverage "only when there is significant attenuation between the direct result of the workmanship defect and the ultimate loss for which coverage is sought, usually due to an independent or fortuitous intervening cause." *Taja Invs.*, 717 F. App'x 192 (applying Virginia law); *see, e.g., Friedberg v. Chubb & Sons, Inc.*, 691 F.3d 948, 953 (8th Cir. 2012) (under Minnesota law, an ensuing loss provision "excludes from coverage the normal results of defective construction, and applies only to distinct, separable, and ensuing losses") (cleaned up); *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 579 (6th Cir. 2010) (under Michigan law, if "damage came naturally and continuously from the faulty workmanship, unbroken by any new, independent cause, the exclusion applies and the ensuing loss provision does not") (cleaned up); *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501 (5th Cir. 2000) (under Louisiana law, ensuing loss provision was triggered only when a distinct and unrelated event caused damage).

In these jurisdictions, courts have uniformly declined to find that an ensuing loss clause covers damage that resulted, in part, due to a defect. For example, mold is not a separate and distinct peril from water damage caused by faulty workmanship because the design or construction defect "naturally and foreseeably leads to water infiltration." *TMW Enters.,* 619 F.3d at 579; *see also Friedberg*, 691 F.3d at 953; *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, CV-01-1362, 2002 WL 31495830 (D. Or. June 18, 2002); *Russell v. NGM Ins. Co.*, 170 N.H. 424, 437, 176 A.3d 196, 206 (2017); *Wright v. Safeco Ins. Co.*, 124 Wash. App. 263, 275, 109 P.3d 1, 7 (2004). Similarly, noxious gas released by defective drywall is not a covered loss because the "odors are inseparable from the drywall and are a continuous result of the drywall," rather than "the result of an extraneous event." *In re Chinese Manufactured Drwyall Prods. Liab. Litig.*, 759 F. Supp. 2d 822, 851 (E.D. La.

2010); *see also Bishop v. Alfa Mut. Ins. Co.*, 796 F. Supp. 2d 814 (S.D. Miss. 2011); *Travco Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010), *aff'd*, 468 F. App'x 195 (2012).

This view of ensuing loss clauses rests on the belief that identifying a distinct, unrelated peril is necessary to avoid nullifying the policy's faulty workmanship exclusion. As the Sixth Circuit explained, *TMW Enters.*, 619 F.3d at 576-77:

> [A]n "all-risk" policy . . . basically covers everything unless specifically excluded. That means the number of possibilities for last-in-time "but for" causes of damage are limited only by the imagination of the reader. What if a roof contains a flawed design . . . and it leaks water into the house, which ruins one of the floors? But for the water, no damage to the floor would have occurred. Yet the contract does not exclude damages caused by "water." Coverage? What if faulty construction allows humid summer air to enter the building, which rusts metal fixtures? But for the exposure to the summer air, no damage to the fixtures would have occurred. Yet the contract does not exclude damages caused by "air." Coverage? What if a poorly constructed ceiling beam falls, smashing the floor below? But for the force of gravity, no damage to the floor would have occurred. Yet the contract does not exclude damages caused by "gravity." Coverage? As in each of these examples, so too here: The very risk raised by the flawed construction of a building came to pass. To say that the risk was not covered because other elements or natural forces were the last causative agents of the damage, though to be sure utterly foreseeable causes of the damages, is to eliminate the exclusion.

Reading ensuing loss clauses narrowly does not necessarily preclude coverage in all cases of faulty workmanship. The case of *Costco Wholesale Corp., v. Commonwealth Insurance Co.*, 45 F. App'x 646 (9th Cir. 2002), is instructive. There, the plaintiff filed a claim for damage to a new warehouse that had differentially settled. *Id.* at 647. The insurer denied the claim under the policy's faulty workmanship exclusion because the building's foundation was plagued by design defects. The plaintiff brought a declaratory judgment action against the insurer, and the district court granted summary judgment in favor of the plaintiff on the ground that the damage was covered under the policy's ensuing loss clause. *Id.* The Ninth Circuit affirmed, explaining that the uneven settling was "distinct from the defective design" because it was caused by shifting soil. Thus, because

"[m]ovement of the earth" was a covered peril that occurred separate and apart from the defective installation, the policy covered the plaintiff's claim. *Id.*

In contrast to the preceding cases, some jurisdictions do not require the covered event to be independent from the excluded peril, but only the direct cause of the loss. *See Leep*, 261 F. Supp. 3d at 1083; *Bartram, LLC v. Landmark Am. Ins. Co*., 864 F. Supp. 2d 1229 (N.D. Fla. 2012); *Selective Way Ins.*, 988 F. Supp. 2d at 538-39; *Eckstein v. Cincinnati Ins. Co*., 469 F. Supp. 2d 455, 462 (W.D. Ky. 2007); *Vision One, LLC v. Phila. Indem. Ins. Co*., 174 Wash.2d 501, 276 P.3d 300 (2012); *Arnold v. Cincinnati Ins. Co*., 276 Wis.2d 762, 688 N.W.2d 708 (2004); *Ariston Airline & Catering Supply co., Inc. v. Forbes*, 5211 N.J. Super. 472, 11 A.2d 1278 (1986). In these jurisdictions, the analysis is straightforward: "If the ensuing loss is also an excluded peril or an excluded loss under the policy, there is no coverage. But, if the policy covers the peril or loss that results from the excluded event, then the ensuing loss clause provided coverage." *Vision One*, 174 Wash.2d at 516, 276 P.3d at 307 (internal citation omitted). Put differently, "the dispositive question in analyzing ensuing loss clauses is whether the loss that ensues from the excluded event is covered or excluded." *Id.*

For instance, in *Arnold*, 276 Wis.2d 762, 688 N.W.2d 708, the Wisconsin Court of Appeals considered whether an ensuing loss clause covered water damage to a home caused by rain that had entered through defective window caulking. The court found that there was "no basis in the policy language for limiting the cause of an ensuing loss to a 'separate and independent peril.'" *Id.* at 785, 688 N.W.2d at 719. Rather, the court explained that "an ensuing loss is a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a 'chance, likely, or necessary consequence' of the loss caused by faulty workmanship or faulty materials." *Id.* at 779, 688 N.W.2d at 716. Turning to the facts of the case, the court held that while the policy did not cover

the cost to repair the caulking, the water damage caused by the rain that leaked through the damaged windows was an ensuing loss.  *Id.* at 785, 688 N.W.2d at 719.

The case of *Selective Way Insurance*, 988 F. Supp. 2d 530, is also illustrative.  In that case, the plaintiff argued than the ensuing loss clause in its insurance policy covered water damage to a brand-new university building caused by a faultily installed water supply line that leaked water.  *Id.* at 532.  Chief Judge Bredar ruled that the ensuing loss clause, which contained language identical to the provision at issue here, applied.  *See id.* at 531, 541.  The court "presume[d]" that the water supply line came loose because of faulty installation.  *Id.* at 538.  But, the court found that the defective installation "d[id] not, by the terms of the policy, exclude the water damage that resulted from faulty installation."  *Id.*  Rather, the court explained, *id.*: "Coverage for water damage—a covered cause of loss—resulting from faulty workmanship or installation—an excluded cause—is a logical interpretation of the ensuing loss provision of the Policy."  Accordingly, Chief Judge Bredar found that the water damage was covered under the ensuing loss clause  because it was "a step removed from the faulty workmanship and was not directly caused by it."  *Id.* at 541.

As is the case when there is an entrenched split of authority, compelling arguments exist on both sides of the issue.  But, there is good reason to think that Maryland law favors a broad construction of the ensuing loss clause contained in Section B(3) of the Policy.  First, reading an implicit "separate and independent" limitation into an insurance policy contravenes the "primary principle" of Maryland contract construction: "to apply the terms of the insurance contract itself." *Bausch & Lomb*, 330 Md. at 779, 625 A.2d at 1031.  Section B(3) provides that if an "excluded cause of loss . . . results in a Covered Cause of Loss," Everest will pay for the "damage caused by that Covered Cause of Loss."  ECF 27-4 at 70.  As there is no indication that the term "results" is a special term of art, it receives its "'customary, ordinary, and accepted meaning.'"  *Springer v. Erie Ins. Exch.*,

439 Md. 142, 158, 94 A.3d 75, 85 (2014) (citation omitted).  The dictionary defines "results" as to "proceed or arise as a consequence, effect, or conclusion" of an event.  *Result*, MERRIAM-WEBSTER, https://bit.ly/32u9KbH (last visited Feb. 26, 2020).  Thus, Section B(3) not only lacks any requirement that the covered event be fortuitous, but by its plain terms it applies coverage to a covered event traceable to an excluded peril.  It follows that a reasonably prudent lay person would understand the clause to cover damage caused by a fire, notwithstanding that the fire was sparked by an earthquake.

Moreover, Maryland courts consider a contract as a whole.  *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d 303, 310-11 (2019); *Clendenin Bros.*, 390 Md. at 458, 889 A.2d at 393.  Here, the anti-concurrent provision in Section B(1) counsels against limiting the ensuing loss clause in Section B(3). Section B(1) excludes coverage for losses caused "directly or indirectly" by certain perils, such as earth movement, war, or nuclear hazard, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  ECF 27-4 at 67.  If faulty workmanship were included in Section B(1), this case would be simple; the defective roof would bar any claim involving the Hotel's roof, regardless of the cause.  But, Section B(3) contains no such language.  Reading Section B(3) to apply only when the covered loss is wholly unrelated from the excluded peril would require engrafting terms into the Policy that Everest could have included in the Policy, but chose not to do so.  *See Kasten Const. Co. v. Rod Enters., Inc.*, 268 Md. 318, 330, 301 A.2d 12, 19 (1973) ("[T]he Court may not, under the guise of construction, rewrite [a] contract[.]").

A stingy construction of ensuing loss provisions is also at odds with the animating purpose of insurance policies.  As the Maryland Court of Appeals explained, although exclusions in a policy should be given effect, they should not be construed to "defeat the main and principal object of the insurance," *i.e.*, to cover insured losses.  *Dorsey*, 56 Md. at 79; *see also Megonnell*, 368 Md. at 656, 796 A.2d at 772.  Limiting an ensuing loss provision to restore coverage only for extraneous covered

perils does just that because in all but the most unusual cases the covered peril and the excluded peril will be but-for causes of the loss.

Consider a building with a weak foundation that is ultimately cut down by an earthquake, or a poorly designed house whose pipes freeze during an unusual cold snap, causing the pipes to burst and flood the house. In each case, both the defect and a specific natural event were a cause of the damage. *See* RESTATEMENT (THIRD) OF TORTS § 26 (2010) (discussing "but-for" or "factual" cause). However, under the narrow approach, the presence of defects (the foundation or pipes) would trigger the policy's faulty workmanship exclusion, overriding the ensuing loss provision. The result is that the narrow approach unduly cabins the Policy's coverage while expanding its exclusions, which is precisely the opposite of how contracts are read in Maryland. *See Megonnell*, 368 Md. at 656, 796 A.2d at 772.

Of course, the common refrain from critics of the broad approach is that it swallows a policy's faulty workmanship exclusion. *See TMW Enters.*, 619 F.3d at 575; *Taja Invs.*, 717 F. App'x at 193. But this concern is misplaced, because an "ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to other property wholly separate from the defective property itself." *Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*, 226 F. Supp. 2d 470, 479 (S.D.N.Y. 2002). For example, in *Selective Way Insurance*, 988 F. Supp. 2d at 540, Chief Judge Bredar determined that although water damage was covered under the ensuing loss clause, the plaintiff was not entitled to recoup the costs incurred to repair the faulty water line. *See also Leep*, 261 F. Supp. 3d at 1084 (water damage caused by a faultily installed furnace was an ensuing loss, but the cost to repair or replace the furnace was not covered); *Bartram, LLC*, 864 F. Supp. 2d at 1235 (finding that policy covered water damage but not the cost to fix faulty workmanship to building's exterior and

interior finishings); *Arnold*, 276 Wis.2d at 792, 688 N.W.2d at 722 (cost to fix defective caulking was excluded but policy covered water damage caused by rain).

Ultimately, I need not resort to tasseography to predict how the Maryland Court of Appeals would read the ensuing loss clause, because the result is the same under either approach. It is undisputed that the roof was defective. When CCS installed the Hotel's TPO roof system in 2015, "too much time elapsed between the application of the adhesive glue striping and the installation of the next layer of polyiso boards." ECF 27-7 at 7. As a result, the roof system's ability to withstand uplift wind pressure was "compromised." *Id.* And, there is no dispute that Section B(3)(c) removes from coverage losses due to "workmanship" that is "[f]aulty, inadequate, or defective." ECF 27-4 at 70. Thus, Bethany is not entitled to damages for the cost to repair or replace the roof.

However, Section B(3) covers the Hotel's interior water damage and lost business income. On September 9, 2018, three years after the faulty roof was installed, a windstorm occurred, which was "an independent or fortuitous intervening cause." *Taja Invs.*, 717 F. App'x at 192; s*ee Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F.2d 148, 151 (4th Cir. 1989) (defining a "fortuitous" loss as one "'dependent on chance'") (citation omitted). Indeed, the storm was a discrete meteorological event, independent of the defective roof. In these respects, the storm is no different than the earth movements at issue in *Costco Wholesale Corp.*, because neither was caused by the faulty workmanship. And, just as the faulty foundation and the earthquake were causes of the damage in *Costco Wholesale Corp.*, here the faulty roof and storm interacted to cause damage to the Hotel.

Notably, a "windstorm" is a covered cause of loss under the Policy. ECF 27-4 at 76. Therefore, all "physical loss" caused by the storm on September 9, 2018, is covered under the Policy, unless otherwise excluded. *Id.* at 67. Undisputedly, the storm damaged the Hotel's roof. ECF 27-4, ¶ 8; ECF 27-6; ECF 27-7. But, because this damage is inextricably intertwined with the faulty

workmanship, it is not covered under the ensuing loss clause.  To be sure, the roof would not have peeled back absent strong winds.  However, it is not disputed that, but for the defective installation, the roof should have withstood the wind.  ECF 26-7 at 7.  Consequently, each dollar spent on the Hotel's roof necessarily serves two ends: repairing storm damage and curing the defect.  Therefore, Everest has no obligation under the Policy to cover the cost to repair or replace the defective roof.  *See Leep*, 261 F. Supp. 3d at 1084; *Selective Way Ins*., 988 F. Supp. 2d at 540.

In addition to the roof, the storm caused interior water damage.  The storm deposited between 0.11 and 0.5 inches of rain.  ECF 27-7 at 3.  That rain ultimately penetrated the Hotel, requiring the replacement of the drywall and carpeting in one hotel room and staining the drywall ceiling of the restaurant.  ECF 27-6 at 4.  Bethany also avers that it has suffered lost business income, although it has not specified the amount of the losses.  ECF 27-3, ¶ 12.  Because these damages are attributable to the storm, which is a covered cause of loss under the Policy, and are distinct from the faulty workmanship, they are covered under Section A and Section B(3).

To be sure, this is not the outcome that either party sought.  Bethany argues that the Policy covers not only the water damage and lost business income but also that the costs to repair the roof.  Conversely, Everest contends that the proximate cause rule trumps the ensuing loss clause. These arguments, however, crumble upon close inspection.

According to Bethany, the Policy covers its claim to repair the roof because it seeks to "replace a roof that had blown off and been destroyed by wind, a Covered Cause of Loss and was no longer on the building, not a roof the [sic] required remedial repairs."  ECF 29-1 at 14.  But, as explained above, given that the roof's defects made it susceptible to wind, it is conceptually impossible to disentangle the damage caused solely by  faulty workmanship and that caused solely by the wind.  Indeed, Bethany's position is no different than trying to parse whether a weak foundation

or gravity is to blame for a building's collapse. *See Performing Arts Cmty. Improvement Dist. v. Ace AM. Ins. Co.*, 13-0945-CV-W-ODS, 2015 WL 3491292, at *6 (W.D. Mo. June 3, 2015).

In short, embracing Bethany's argument would transform the ensuing loss clause into a "grant back" provision and eviscerate the faulty workmanship exception. Because an ensuing loss clause only covers "property wholly separate from the defective property itself," *Montefiore Med. Ctr.*, 226 F. Supp. 2d at 479, Everest has no obligation under the Policy to cover the cost to repair or replace the roof. *See Leep*, 261 F. Supp. 3d at 1084; *Selective Way Ins.*, 988 F. Supp. 2d at 540.

In contrast, Everest argues that, even if the storm is a distinct cause of damage, it does not trigger the Policy's ensuing loss clause "because the defective work is the efficient proximate cause of the damage to the roof." ECF 28-1 at 18. Borrowed from principles of causation in tort law, the doctrine of efficient proximate cause provides for coverage where an insured peril sets in motion a chain of events that includes excluded events. *See* COUCH ON INSURANCE § 101:45 (discussing efficient proximate cause and collecting cases); *see, e.g.*, *Russell*, 170 N.H. at 438, 176 A.3d at 207; *Vision One*, 174 Wash.2d at 519-20, 276 P.3d at 309-10. Applying the principle here, Everest maintains that the defect is the "predominant cause" of the damage and therefore the Court should find that Bethany's losses are not covered. ECF 28-1 at 19.

As the parties acknowledge, the Maryland Court of Appeals has not addressed the applicability of the efficient proximate cause doctrine to first-party property claims. *See* ECF 28-1 at 18; ECF 29-1 at 14. However, in *Liberty Mutual Fire Insurance Co.*, 535 F. Supp. 2d 532, 540 (D. Md. 2008), Judge Fredrick Motz cogently set forth the reasons why the Maryland Court of Appeals "would not apply the efficient proximate cause rule, but would instead follow the plain language of [a] clause in the policy's exclusion." His reasoning is consonant with the Maryland Court of Appeal's clear directive to apply the terms of the insurance contract, *Bausch & Lomb*, 330 Md. at 779, 625

A.2d at 1031, and its refusal to import tort law principles to the interpretation of insurance contracts. *See Selective Way Ins.*, 988 F. Supp. 2d at 539; *see, e.g.*, *No. Assurance Co. of Am. V. EDP Floors, Inc.*, 311 Md. 217, 229, 533 A.2d 682, 688 (1987) (declining to apply proximate causation to insurance policy); *Aragona v. St. Paul Fire & Mar. Ins.*, 281 Md. 371, 379, 378 A.2d 1346, 1351 (1977) (admonishing that "principles of causation will not be applied to defeat the intent of the parties, as manifested in the insurance contract"). In sum, I shall not rely on a doctrine grounded in tort law to thwart the plain language of the Policy.

To summarize, the cost to repair the Hotel's roof is excluded from coverage under the faulty workmanship exclusion in Section B(3)(c). In contrast, because a windstorm is a covered cause of loss according to Section G, and the storm that damaged the Hotel occurred subsequent to the faulty installation, the damage caused by the storm, apart from damage to the defective roof, is an ensuing loss under Section B(2). Thus, the Policy provides coverage for the Hotel's water damage and loss of business income unless those losses are specifically excluded by other Policy provisions.

### B. Water Damage

Separate and apart from Section B(3), Everest argues that coverage for the Hotel's water damage is barred under the "water exclusion" in Section B(1). ECF 28-1 at 23. Section B(1)(g) excludes from coverage damage "caused directly or indirectly" by "surface water . . . whether or not driven by wind . . . ." ECF 27-4 at 68. According to Everest, "surface water" includes rainwater that collects on a man-made surface, such as a roof. ECF 28-1 at 23-24. It follows, Everest posits, that Section B(1)(g) excludes Bethany's claim from coverage because rain fell on the Hotel's roof, collected into a pool once the TPO membrane was temporarily affixed to the roof, and then migrated to the Hotel's interior. *Id.*; *see* ECF 30 at 18.

Bethany acknowledges that rain water can sometimes be surface water, but it submits that the Wind-Driven Rain Limitation, not Section B(1)(g), is the operative provision. ECF 29-1 at 23. Under

that endorsement, Everest will cover damage up to $250,000 for damage caused to the "interior of any building or structure" due to "rain driven by wind" if "the building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain enters." ECF 27-4 at 66. This provision "unquestionably" applies, Bethany explains, because the windstorm, a covered cause of loss, damaged the Hotel's roof, resulting in water damage. *Id.*

The Wind-Driven Rain Limitation is susceptible to only one interpretation and it applies to cover Bethany's claim for water damage. A windstorm is a covered peril. ECF 27-4 at 76. On September 9, 2018, a windstorm peeled back a portion of the Hotel's roof. ECF 27-6; ECF 27-7. As a result, rain from the storm fell on the roof and ultimately seeped into the Hotel, causing water damage to a suite and to the Hotel's restaurant. ECF 27-6 at 4. Thus, there is no genuine dispute of material fact that the Hotel "first sustain[ed] damage by a Covered Cause of Loss to its roof," that "rain driven by wind" penetrated the roof, and that the Hotel suffered interior water damage. ECF 27-4 at 66. Consequently, the Wind-Driven Rain Limitation unambiguously covers the Hotel's water damage.

Everest's reliance on the exclusion in Section B(1)(g) for damage due to "surface water" is unavailing. Certainly, Maryland courts have treated bodies of rain water as surface water. *See Mateer v. Reliance Ins. Co*., 247 Md. 643, 233 A.2d 797 (1967) (defining the term "flood" in an insurance policy); *City of Cumberland v. Willison*, 50 Md. 138, 150 (1878) (surface water includes streams caused by rain or melting snow); *accord Bao*, 535 F. Supp. 2d at 535-36 (applying Maryland law, rainwater that flooded a basement was "surface water").

However, it is far from obvious that the Maryland Court of Appeals would treat rain that collected on a roof as surface water. Indeed, Everest cites to no Maryland authority, and I am aware of none, supporting the contention that surface water includes water that collects on a roof before

soaking into a building. *See* ECF 28-1 at 24 (relying on *Martinez v. Am. Family Mut. Ins. Co.*, 413 P.3d 201, 206 (Colo. App. 2017)). This defect is fatal to Everest' argument, not only because Everest has the burden to establish that the "surface water" exclusion governs, *Finci*, 323 Md. at 593 A.2d at 1087, but because Maryland construes exclusions in insurance policies narrowly. *Megonnell*, 368 Md. at 656, 796 A.2d at 772.

Accordingly, because the Wind-Driven Rain Limitation in the Policy applies, Everest is liable to Bethany for water damage that the Hotel sustained up to $250,000, minus the deductible.

### C. Loss of Business Income

As indicated, Bethany asserts that the Policy covers income that the Hotel lost due to the storm. ECF 1, ¶ 28. Section A9(1) of the Policy provides that Everest "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations during the 'period of restoration.'" ECF 27-4 at 54. However, in order for the suspension to be covered under the Policy, it "must be caused by direct physical loss or damage to property" and the "loss or damage must be caused by or result from a Covered Cause of Loss." *Id.*

Bethany has established both requirements of Section A(1). It asserts that a storm caused water damage to the Hotel. ECF 27-2, ¶ 11; ECF 27-3, ¶ 12. Everest does not contest that the Hotel's suffered water damage, which constitutes "physical" damage. ECF 28-1 at 6. Nor does Everest dispute that the Hotel lost business income as a result of the storm. *Id.* And, the occurrence of September 9, 2018, is a covered cause of loss under Section G, for the reasons already set forth. Therefore, there is no genuine dispute that the Policy covers the income that Bethany lost, to the extent that it suspended operations because of the interior water damage caused by the storm.

### IV.    Conclusion

For the reasons stated above, I shall GRANT the Bethany Motion (ECF 27) in part and DENY the Everest Motion (ECF 28).

An Order follows, consistent with this Memorandum Opinion.

Date: March 5, 2020

_____/s/_____
Ellen L. Hollander
United States District Judge